We will hear argument first this morning in case 21-954, Biden against Texas. General Preligar. Mr. Chief Justice, and may it please the Court. The Secretary of Homeland Security exercised his statutory discretion to make a policy judgment. He found that the benefits of MPP were outweighed by its domestic, humanitarian, and foreign policy costs. Yet the lower courts ordered DHS to Mexico to send thousands of noncitizens into its territory. That was error. On the first question, Section 1225 confers a discretionary return authority that the Secretary may use, not a mandate. Nothing in the statutory text or history compels DHS to use MPP whenever Congress fails to provide sufficient funds for universal detention. Respondents identify no one who interpreted Section 1225 this way before this lawsuit. No member of Congress or executive branch official or anyone else. And on this reading, every presidential administration in an unbroken line for the past quarter century has been an open violation of the INA. The Court's interpretation compels sensitive foreign policy negotiations and would require transformative changes to the government's border operations. If Congress had wanted to mandate those results, it would have spoken clearly. On the second question, respondents have abandoned virtually all of the District Court's reasons and the Fifth Circuit's reasons for finding that the October 29 termination decision has no legal effect. Texas now concedes that DHS was permitted to respond to the District Court's remand by issuing a new decision. That's just what the Secretary did following a multi-week reconsideration process. Respondents claim that the Secretary didn't really have an open mind in that process, but the APA doesn't impose an amorphous open-mindedness requirement, and respondents have not carried their heavy burden to show that the October 29 decision was pretextual. This Court should reverse the judgment below, and the Secretary should be allowed to finally put his policy decision into effect. I welcome the Court's questions. Justice Thomas, we included a footnote in our opening brief in this case to make clear that we were continuing to press our Section 1252 F1 arguments. Of course, we recognize the District Court's position that the District Court had no authority to enter the injunction that it did because that would enjoin or restrain the operation of the INA, and only this Court has jurisdiction to enter an injunction like that. You emphasized the foreign relations concerns that arise in this case, but we've said in previous hearings that the District Court has no authority in this area. Beyond that, if Congress has already legislated in this area and expressed those concerns, then what additional concerns should we take into account? Well, Justice Thomas, I think that the particular interpretation of the statute that the District Court adopted here implicates grave and serious foreign policy implications. Of course, the Executive Branch has primary responsibility for managing foreign relations and conducting those kinds of negotiations. I think that if Congress had intended to override the Executive's ordinary discretion that it enjoys with respect to that kind of foreign policy relationship, then at the very least, it should have made that intent expressed in the statute. Instead, if you look at the text of Section 1225 B2C, this is the contiguous territory return provision, what Congress said is that the Secretary may return. Congress in no sense indicated that it was actually imposing on the Executive a mandate to engage in those kinds of ongoing negotiations with Mexico, not just to obtain its consent at the outset, but the enormous investment of diplomatic resources that it takes to engage with Mexico on a day-to-day basis to implement this policy. And Congress should at least have said that clearly in the statute. But I think their argument is that it was, I apologize for the delay, that you shall detain. And the shall, I think they see as a baseline, and then the others are, there's limited discretion to parole or to do other things. But it seems as though they think that discretion is consumed by the shall. Well, Justice Thomas, let me respond to that in a few different ways. I want to emphasize at the outset that we think that DHS is relying permissibly on its express statutory release authorities here. So it's the parole authority you mentioned in 1182 D5. It's also the authority to grant bond or conditional parole under Section 1226A, which is a provision that respondents largely ignore. So we think that the releases are consistent with those express authorities. And we think that the language in 1225 B2A, the shall be detained language that you referenced, should be interpreted against the backdrop of limited law enforcement resource. No one disputes that DHS does not have sufficient capacity to detain everyone who could be subject to detention under that provision. But I should say also that if you disagree with everything that I just said, or think that there is more room for doubt about how DHS implements those detention and release authorities, still, I don't think that provides any license to rewrite Section 1225 B2C in contravention of its plain language. Congress said there may return. It didn't create the kind of mandate that respondents are now reading into Well, I mean, you say if we disagree with you on the other grounds, that's not a basis for adopting an erroneous interpretation of the third provision. Well, where does that leave us? I mean, I am sympathetic with your position, which is that you can't detain enough people. You don't think you have to send people back through the return mechanism. And that's fine, I would say. One way to look at it is you're sort of taking away from yourself an option to comply with the statute. And then it gets to a question of the parole, interpretation of the parole provision, and whether or not I think significant public benefit can accommodate as far as you want to stretch it. So if I get to the point of looking at this and agreeing, basically saying there's nothing you can do, given the statutory requirements. You're in a position where the facts have sort of overtaken the law. What are we supposed to do? It's still our job to say what the law is. And if we say what the law is, and you tell us we can't do anything about it, where do you think that leaves us? Well, I would say at the outset that to the extent that the court is inclined to say what the law is with respect to the detention and release authorities that you mentioned, 1225 B2A, parole, I think that those should be challenged on their own terms if respondents disagree with how DHS is implementing those provisions. And instead, respondents said in the district court that they weren't even challenging our parole policies. Any judicial relief that could be necessary in that context should focus on those provisions. But I mean, let's go through them. You don't, detention is not, it is what, a 2% answer to the problem. So we can put that to one side. I don't think they have to challenge detention for the reality to be there, that that's not going to help you get to where you need to get. And with respect to the others, again, assuming that I find significant public benefit to be a more substantive restriction than perhaps you do. I guess, again, where does that leave us? Well, I think it would leave the court. If you have a situation where you're stuck because there's no way you can comply with the law and deal with the problem there, I guess I'm just wondering why that's our problem. Our problem is to say what the law is. And if you are in a position where you say, well, we can't do anything about it, what do we do? Well, I agree that it's not your problem in this case. I think that to the extent the court interpreted the provisions along the lines you're suggesting, that that could at most support a judicial order that we need to detain more people or we need to change how we're releasing people. But again, I would go back to the central issue in this case. The court's responsibility here is to look at how the district court interpreted the contiguous territory return provision. And none of those concerns about detention and release could in any sense justify transforming that position contrary to Congress's plain language, the May return language, with all of the consequences that would have for our foreign relations. So I think the simplest route to resolving this case is to say that. I don't think the court actually needs to say anything more. It's not necessary to resolve any of those 1225 or 1226A. All the court needs to say in this case is that the contiguous territory return provision does not carry the meaning that justify the district court's injunction in this case. May I ask you about the jurisdictional question that Justice Thomas raised? You argue that we lack jurisdiction because the district court lacked jurisdiction. You devote two sentences and a footnote to the question. I want to see how far your jurisdictional argument goes. So do you think that 1252F1 barred the district court from vacating the secretary's decision to stop using 8 U.S.C. 1225B2C authority to return aliens to Mexico? Well, I think we focused on the injunctive relief in this case, and I think that there's an additional question about vacater. I do believe that our arguments would extend to that as well. To the extent that you're worried about the extent of the briefing in this case, I would, of course, refer back to our briefing in Alamán-Gonzalez. We also briefed... Oh, I'm very well aware of the briefing in that case. It doesn't say anything about the APA, and that's my principal concern right here. So your answer is that it would prevent a district court from reviewing immigration rules dealing with the relevant provisions of the INA under the APA. The district court could not do that. To the extent that that would entail the district court in setting aside the agency's action, I do think that that would fall within the bounds of our interpretation of F1. Let me ask you this to address this authority, the return authority, to promulgate a policy where every alien who arrives on land from a foreign country contiguous to the United States was required to return to Mexico or Canada pending the initiation of a removal proceeding under 1229A. And then suppose DHS also promulgated a policy where neither 1229A removal proceedings nor asylum proceedings could be initiated for any of those aliens until 10 years after their removal. Okay, get the hypothetical. Would any court besides this court have jurisdiction to hear a challenge seeking to vacate that policy? Well, I think that, of course, there would be jurisdiction in the lower courts with respect to individual noncitizens who are raising that challenge. And that's, I think, the premise of Section F1 that Congress is trying to channel those types of claims into individual proceedings with respect to individual noncitizens. So there would be jurisdiction in that circumstance. But it would have to be done on an individual basis. There could be no request under the APA to vacate that order, that policy saying everybody covered has to stay in Mexico for 10 years. Well, obviously, that policy could be challenged in the individual case. And so I think it could be taken on its own terms there. And don't you think that that's a, you might be right, but don't you think that's a far-reaching argument? Don't you think that goes well beyond anything that would come to, that we would have thought about in Garland v. Gonzalez? Don't you think that deserved briefing? Well, certainly, Justice Alito, I defer to this court and how it's choosing to resolve those issues in Aleman-Gonzalez. With respect to additional briefing, we did include briefing on this issue at the stay stage in this case as well. So I would refer to our- Well, did you say anything about the APA in the Gonzalez case? I'm sorry that I can't recall right now whether we briefed that issue there. If you're telling me we didn't, I assume we did not. On the jurisdictional question, you think that we should go back and read what you've submitted below. It wasn't important enough for you to submit it to us directly. We did brief this issue at the stay stage in this case. And this court, we understand, denied the stay nevertheless and found a likelihood of success on the merits with respect to the procedural APA claim on the June 1st memorandum. So that's why we didn't renew our briefing on this issue at the merits stage. Counsel, are you taking the position that 1252F1 also eliminates declaratory judgment rulings? There is a difference between issuing an injunction vacating an agency action and issuing a declaratory judgment that agency action is unauthorized and letting that come to this court to decide what remedy is appropriate, whether an injunction is appropriate or not, if you decide not to follow the statement, correct? There's nothing in a declaratory judgment rule that forces you to. You might be subjecting yourself to contempt, but you can stay that pending review by this court, couldn't you? That's right, Justice Sotomayor. So I think that it would be possible for the court to draw that distinction and distinguish between declaratory relief and injunctive relief. You don't see anything in the language of 1252F1 that stops declaratory relief? I believe when Aleman Gonzalez was argued, we suggested that that was an open question, and I recognize that it's a more difficult question. Here, I think that it's clear that our F1 argument applies because we're facing a nationwide permanent injunction in this case. Now, what do we... I'm sorry. I'm sorry. Go ahead. I just want to follow up on that. Go ahead. Okay. I would just appreciate an answer to Justice Sotomayor's question about declaratory relief in the government's position with respect to 1252F. I'm sorry, a clarification? Yeah, just... I'll do my best, and I should confess that I didn't go back to review the oral argument transcript in Aleman Gonzalez, but I think we took the position there that it's an unsettled question how this would apply in the context of declaratory relief. And so I want to be consistent with that position, but I recognize it's a harder issue for us, and I think that there would be a path for the court to determine that there's a distinction between declaratory relief and injunctive relief, which is, of course, the primary focus of that provision. I understand it's an open question and a difficult one. I just wonder whether the foreclosed review of declaratory relief, but I recognize the court could conclude otherwise. Why would it foreclose declaratory relief? I'm sorry, Justice Gorsuch, I don't have further information at this time. If you'd like us to submit supplemental briefing on this issue, we would be happy to do so to try to clarify that position. But it is the government's position that it does foreclose declaratory relief, too. I believe that's the position we took at oral argument in Aleman Gonzalez, recognizing it was a tougher issue. Thank you. If I could turn to the various textual clues and contextual clues that we think fortified our interpretation of the contiguous territory return provision in this case, there are really four key things that I want to focus on that I think demonstrate that the district court's interpretation here went seriously awry. And the first thing, of course, is the text, which was emphasized that Congress used the may return language, which is clearly discretionary. On respondents' interpretation, what Congress really meant is the secretary may return unless detention capacity is lacking, in which case he must return. But Congress nowhere put that condition precedent into the statute. And I think it's really significant that Congress failed to do so because on respondents' reading, this would have been mandatory from the outset and at all times thereafter. In 1996, when Congress enacted this provision, there was not sufficient detention capacity at that time, and respondents don't dispute that that has remained continuously the case. So I think it's particularly notable that their interpretation of the statute would have run counter to the text all along. I would point as well... Any indication in connection with the 96 Act that anyone in Congress expected that if there was not sufficient detention capacity, that hundreds of thousands of people would be just paroled into the United States without being lawfully admitted? Did anyone say that in Congress? I don't think that there was expressed history on that point, but Congress was focused on the at the same time would function to alleviate part of the strain on detention resources. So I think that history actually shows that Congress here wasn't thinking that contiguous territory return would be the solution to this issue. Instead, they were focused on expedited removal to do so. And it's no mystery about where this provision came from, contiguous territory return. It was a much narrower and more discrete problem, which was that the Board of Immigration Appeals in the Sanchez Avila case had just concluded in 1996 that the executive's prior discretionary practice of sometimes returning some non-citizens to contiguous territory required express statutory authorization if it was going to continue. And Congress provided that express statutory authorization in 1225 B2C, but there is no indication that it meant to go further and actually transform that prior practice and turn it into an ongoing mandate that DHS must implement this on a borderline basis, consistently based on a lack of detention appropriation. Go ahead. The Fifth Circuit reasoned that didn't just didn't deny that the provision you're talking about uses the term may, but it said that if you read the relevant statutory provisions, they give DHS three options. One is to return these individuals to Mexico or Canada. The second is to detain them. Third is to have case-by-case determinations regarding humanitarian issues and public benefit. A cornerstone of that is the 1225 B2A says the alien shall be detained, right? That's correct. And you now read that to be discretionary in light of Castle Rock. Is that correct? No. To be clear, Justice Alito, and I appreciate the opportunity to offer clarification on this point, we are not suggesting that that language in B2A essentially functions as a may, that Congress didn't express a preference on this issue. What we think, though, is that against the background of Castle Rock, it's appropriate for DHS to take account of its limited detention capacity for purposes of exercising its various authorities, and that includes the express release authorities. So there's parole. You mentioned it. You left off the list, Section 1226A. We think that's another important source of authority for DHS here. That's what you just said sounded to me like a lot of words that means that we have discretion. We have prosecutorial discretion to decide whether to detain. Shall be detained doesn't literally mean shall be detained. I think what it means- Is that correct? Well, I think in this context, what shall be detained means is that Congress expected us to use the detention capacity that we have, and that's what we're doing. DHS detains tens of thousands of individuals on any given day. Respondents' interpretation that would remove any discretion would mean that DHS can't take account of that limited capacity in making prioritization decisions. So if they're really right, and if DHS has to fill up those beds on a first-come basis, then the upshot is that it's going to run out of space and not have capacity to detain those with criminal histories or who represent a national security threat or have final orders of removal and might be particularly likely to abscond, and I don't think that's a reasonable interpretation. Well, I'll tell you one- Excuse me if I ask one more follow-up. I'll tell you when I read your brief on this point, I said, wow, I remember the Jennings case where I had the pleasure of writing the opinion for the court, and I said, well, my recollection is that the government's brief in that case took exactly the opposite position from what the government is taking here, and I went back and looked at it, and that is exactly the case. You stressed that shall be detained means shall be detained. I have it right before me. You emphasized the language, shall be detained, and you went on. This is a brief filed by your predecessor, Mr. Gershengorn. Unlike the word may, which implies discretion, the word shall usually connotes a requirement, and here the repeated shall be detained clearly means what it says, because Congress said may when it meant may. Congress crafted only one exception to that rule. Congress provided that the Secretary may parole into the United States any alien applying for admission on a case-by-case basis for urgent humanitarian reasons or significant public benefit. Let me respond to that in two ways, if I could, Justice Alito, and the first is to make clear that, of course, there we were addressing a very different type of argument, which is whether Section 1225 contains effectively an implicit statutory entitlement to release on bond, which is what the noncitizens in that case were claiming, and we said then and remain of the view, and this court said in Jennings, that that's not a proper interpretation of that shall be detained language, but we had no occasion in that case, and this court had no occasion in that case to consider how to interpret these provisions of the INA against the backdrop of traditional enforcement discretion principles, and I would point in particular now to the opinion of Chief Judge Sutton in the Sixth Circuit, a recent opinion we cite in our reply brief in the Arizona case that I think has a really useful distillation of the relevant principles in this context when you're looking at those types of provisions in the INA in light of limited law enforcement resources, but the second point I'll make is that to the extent you are focused on this differential use of shall and may, I think that only fortifies our principal contention in this case, which is that the contiguous territory return provision uses that discretionary may return and its respondents position that would actually fail to give effect to Congress's drafting choices by turning that mandate. Do you think that as to each non-citizen, that you have to comply with one of the four, let's call them now because you added bond, that you have to comply with one of the four options that the statute gives you, or do you think that there is a kind of residual discretion so that even if an immigrant could not be paroled under 1182, you could still release that immigrant rather than detain him? So I think the question of residual discretion is a difficult one, and we haven't had to process that here because we think that DHS is complying with those four statutory options. Our position is that DHS is faithfully implementing both the parole provision in 1182d5 and the bond and conditional parole provision in section 1226a, and I think that its implementation of those provisions suffices in itself to resolve this case because respondents as the plaintiffs alleged and said that DHS is violating those obligations but came forward with no evidence to substantiate that claim. I mean, I think General Stone's position is sort of we don't need evidence because it's kind of laughable on its face to think that you're paroling this many people by using case-by-case determinations rather than I think his word is en masse. Well, those kinds of arguments just don't engage with the statutory text here. 1182d5 has a procedural requirement, case-by-case adjudication. DHS does that. It does not grant parole to any individual non-citizen without reviewing the individual case and making an assessment of individualized factors like flight risk, likelihood of responding, and whether the release of that individual would advance an urgent humanitarian reason or a substantial public, significant public benefit. That's of course the substantive criteria. Our position is that DHS can permissibly take account of its detention capacity in determining that there is a significant public benefit from releasing a low-priority individual who's not a flight risk, who doesn't have a criminal history, if that would preserve a bed space for someone who's a higher priority under our detention policy. But you were saying we don't need or you don't need to argue for residual discretion because you're not using any residual discretion. That's right. We are not using residual discretion here. That's correct. We think that we do not need residual discretion here and I think that it's an interesting question but it's largely an academic one because here DHS's release authorities amply justify what it's doing on the ground. Counsel, can you tell me what case-by-case review means? Part of your answer addressed it, but each alien is interviewed? That's right. So there's a background check done on them? There's usually a criminal background check done. There's a biometric records check that's completed and DHS reviews that information and makes judgments about things like flight risk and security concerns for purposes of administering these provisions. I'm assuming there's a terrorist list of some sort or database that you look at as well? I assume so as well, although I haven't checked with DHS on that. And presumably you find out what ties or not the person has to the United States and whether they've absconded before, et cetera? That's right. So by regulation, DHS is required to take into account those kinds of considerations insofar as they bear on flight risk and the parole determination will only be made after making a judgment that the person does not likely present a flight risk. Now, your adversary, General Stone, points to a lot of legislative history that Congress intended 1182 D5A to be narrow. Virtually all of the history that he points to is a House committee report, correct? That's right. And it was a committee report that addressed a different version of the statute, not the one that was enacted. So with respect to this statute, was there anywhere a directive by Congress to limit the number of people? No, there's certainly nothing in the text of the statute that Congress enacted that places that kind of cap. Instead, Congress directed how parole determinations need to be made case by case, and it set forth that substantive criteria of the basis for parole, but it nowhere suggested that there is a numerical cap on the number of people who can receive parole. Now, please tell me how you satisfy the urgent humanitarian reasons or significant public benefit requirements of the statute. We satisfy that because there is a significant public benefit in ensuring that DHS doesn't run out of detention space to house individuals who are higher priorities for detention because of their criminal records or because they might be particularly likely to abscond or because Congress itself has directed that they should be detained without release under provisions like 1231A2, 1226C. And DHS's judgment in implementing the statute has been, I think, properly interpreted against the background of enforcement discretion here, that that serves a significant public benefit in ensuring that it doesn't run out of capacity. When someone is a low-priority individual because they don't have a criminal history, they're not a danger to society, they aren't likely to abscond. How about the issue of whether you have enough resources to detain all these people, feed them, clothe them? If you don't, you're going to let them starve and you're going to have the horrific conditions that have gotten so much public attention, correct? Well, certainly DHS is committed to providing humanitarian conditions for detention. If you had to detain everybody, could you? No, and no one disputes that. DHS does not have sufficient detention capacity. Congress knows that. Congress was aware of that in 1996 when it enacted this provision and there is no indication that Congress intended the safety valve here to be contiguous territory return. What are the numbers with respect to that, both now and in the past, in terms of the percentage of people who are stopped or encountered or arrested at the border? Think of those as synonyms. I didn't mean to. Versus the number that you can detain. So let me give you a sense of the current numbers. I'll point to the recent monthly reports that we've been filing in accordance with the district court's reporting requirement of the injunction. The most recent numbers are from March 2022. At that juncture, DHS apprehended about 220,000 people at the border. That was the number of border encounters. At that point in time, DHS was appropriated for a little under 32,000 detention beds, counting some COVID restrictions, some court restrictions in place. And the average daily amount of detention over that same month was also at about 32,000 individuals. That's ICE being a little under its capacity and CBP being over capacity. So I think that it's kind of self-evident and no one disputes here that there is a tremendous shortfall and that DHS could not detain everyone who it's encountering at the border. You say 220,000 come in. Yes, about 220,000. Per what? Per month, per day, per week, per what? This was in March 2021. In a month? You're saying 220,000 in a month or 220,000 in a week or what? No, in one month. Those were the numbers for now. Now, of course, 220,000 come to the border and about 30,000 or so, 38,000 are detained and the rest are paroled. Well, there are a variety of tools that DHS uses. They're not all paroled. Some are expelled under Title 40. These are the ones who are expelled. So how many are paroled about? In March 2021, I believe the parole figure was about 37,000 and then there were another 43,000 that received bond or conditional parole under Section 1226A. There were 110,000 or 120,000. We don't know what happened to them. Where'd they go? Many of them were expelled pursuant to Title 42. Others were... Half of them, they say you have no business here and that comes right under here that they're not... Oh, under 42. In other words, under the... The public health order that the CDC had issued. That number, though, also includes other processing under Title 8 authorities. Here, I'm worried about... Suppose I accept your argument hypothetically. Let's assume that. Then I say, I see. Small b has to do with people whom the immigration person at the border says you're inadmissible or you want asylum and tells you what to do. But now we go to our part, which is other people who come in. I don't know if they're inadmissible or not. Maybe, maybe not. That's what we're... This is number two, is that right? I'm sorry, you're looking at 1225B2? Yeah. B? It says inspection of other aliens. Those are the aliens who were not in the first part, which is the first part. Oh, I'm sorry, you're looking at B1, so you're looking at the... B1 are certain people where they say you're inadmissible, goodbye. Or they say you want asylum and here's a procedure. That's right. Then it says admiss inspection of other aliens. That's what we're talking about. That's correct. Okay. Who are the others? The others are the ones you don't know if they're inadmissible or not. So these are the ones who wouldn't be inadmissible under the grounds that are specified in B1. Okay, okay, we got there. I said there are three things you can do. One is, as you say, confine them, you know, detain. Number B is an exception and number C is send them back to Mexico with the word may. Okay? So we've got those three things right equally under the statute. And it says may. So what happens if you say no? And it seems to say shall be detained. And that's what we're talking about. I suppose you just don't detain them, vast numbers. You parole them. You say I can do that because of 1182. So I got the structure in my mind. But you are not doing what they said, which shall be detained. Well, we can parole them, case by case. Okay, suppose you lose on that. At that point, you have Congress telling you shall be detained and you're not doing it. What happens? I'm asking you that because the words are important. And the reason I ask you that is, this is not the first time Congress has said to an agency, do it, do it by May 15th. May 15th comes, they haven't done it. That happens. More than you might think. Okay, so there's a case law history there of what judges did when the government just didn't do what Congress told them within the time frame they were supposed to do it. Have you looked at that? Do you know what that was? My impression, very vaguely at a distance, was the judge sort of tried to work things out. They sort of tried to negotiate with the agency. They sort of, they didn't just order them detained. They ordered the assault regulation issued because they couldn't. What happened? And does that have any instruction for us? Well, I think here I have a couple of reactions to that, Justice Breyer, and I hope I can work through them. I first want to push back on the idea of how you describe the statutory structure only in so far as I think that it's wrong to treat this as a self-contained unit. It's not as though Congress sat down at one point in time and thought this is going to be our universal solution for how to deal with these encounters at the border with this classified citizen. Instead, all of these provisions were added to the statute at different times and for different reasons. The shall be detained language came in 1903. That was first. Then Congress added the parole authority in 1952 in the INA. And that was actually a codification of the executive's prior practice of granting parole even when it didn't have expressed statutory authority to do so. It was only in 1996 that Congress added the C that you refer to, contiguous territory return. And so I just want to push back on the suggestion that this was all at one point in time with That suggests the argument that you gave up on. And that was the argument that shall doesn't literally mean shall this instant. It means shall as best you can. Now you've given up on that argument, I think, or have you? Well, no, I think shall properly interpreted means that we should use the detention capacity that we've been afforded here. I think that the argument and my response to Justice Hagel was that we have expressed statutory release authorities here. We think that all of these releases are happening in conformance with the INA. Left off your list as well was 1226a. This is an important source of authority for DHS. This is a provision that applies, as all agree, to anyone who is in the United States. But these are people that are coming to the border. I thought 1226a does just what you say. It applies to people who are already here. And I didn't think therefore it applied to this case particularly because I think here we're dealing with people who come up to the border. Tell me why I'm wrong on that. You're wrong on that because DHS's longstanding interpretation has been that 1226a applies to those who have crossed the border between ports of entry and are shortly thereafter apprehended. So that's an important category of the group of non-citizens that we're talking about here. And it memorialized that understanding and regulations shortly after IRA-IRA was enacted. And as well, that has been the agency's consistent interpretation across the subsequent 25 years. The October memo does not rely on 1226. Justice Kavanaugh, I think that the October memo, of course, wasn't focused on any of these issues about detention or release because the Secretary was making a judgment about whether to continue with MPP. And that was his policy judgment weighing all of the costs and benefits of the program. No, in the section about the relationship between MPP and statutory mandates, it was all about significant public benefit under the parole authority. That's right. But he discussed that at length because that is an important source of DHS's authority here. I believe he also referred to the authority that's conferred by section 1226A. I need to know this for this reason, that I think, suppose we do exactly what you suggested we might do. May means May. Okay, end of the matter. Then the thing goes back. At that point, I'm guessing, but somebody might say, okay, May means May. You don't have to send them back to Mexico, but you do have to detain them. No, we don't, because of the two statutes you mentioned. Yes, you do, because they don't apply. There'll be an argument. I don't know if one, we should foresee that argument and take a view, or two, we should foresee that argument and not take a view, or three, we should just forget about that and just say whether May means May. I think that is the simplest way to resolve this case. We certainly agree that May means May. That's really the only issue that's directly teed up for this court's review in light of the injunction. We are actively litigating those other issues and other cases brought by states with respect to our interpretation of 1225B2A, with respect to our application of the release authorities. I think that that is a better context where it's not essentially relying on those release and detention authorities as a collateral way to force the reimposition of MPP. General, I could understand General Stone saying back to you, well, May means May, but you have to read that May within the entire statutory structure and within the set of authorizations that you have. Essentially, the May would become a shall if you couldn't meet the obligations, if you were using completely residual discretionary authority, so that if you couldn't parole people under 1182, give them bond under whatever that provision is, et cetera, et cetera, and you were just throwing up your hands in the air and saying, well, we have to do something, so now we're operating outside the statute entirely. I could see him saying, well, in that case, the May becomes a shall. It's kind of a springing mandate if you can't satisfy your obligations in another way. So I have to think, am I wrong about this? But your argument depends on the fact that you say you are satisfying your obligations in other ways. If you weren't, wouldn't you have a harder argument? No, I don't think so. I think that's actually an easy argument in this case. We certainly do think that we're satisfying those other provisions, so the predicate of Texas's suit fails here. But even if this court disagreed or thought there was room for doubt, there is no way to interpret section 1225B2C to be that kind of springing mandate. First, there's a textual problem. Congress said May return. On their view, it's been mandatory from the get-go and at all times thereafter, and it would be inexplicable for Congress to use that discretionary language if it wanted to have detention capacity be the trigger. Second, I would point to the significant foreign policy consequences that are implicated by that interpretation. We cannot unilaterally implement foreign contiguous territory return. Instead, each exercise of this authority requires ongoing negotiation and cooperation and coordination with Mexico. And there again, it's implausible that Congress would have demanded that we do that, that the executive branch engage in those negotiations without saying so expressly and just using May return. Third, I'd point to the history. No one at any point in time during the legislative drafting acknowledged that the provision would have this kind of effect that they're attributing to it. Instead, the history is clear that this was just responding to that BIA decision and overturning the conclusion that the executive's prior discretionary use of the authority required authorization with no indication that Congress was changing it into a mandate. And then fourth, and finally, I would point to the consistent executive interpretation of this provision. No one's interpreted the INA this way before. Every presidential administration has understood this to just be a purely discretionary authority. That goes for the prior administration. On their view, MPP itself would be unlawful because it doesn't maximize the use of contiguous territory. Pardon me, General. Your interpretation of the statute, I think, is entirely manipulable. You use the statute has what seems to be a serious limitation on parole, significant public benefit. And yet you say that goes down due to the fact that you have limited detention. So and you have limited detention. It's not like you're going to hit a number there which is going to take care of everything. More than 30,000 are going to come in at a time. And you say, well, it's not. It's actually less than that because we have to save a number of beds for this. So you can have a phrase in the statute mean what you want it to mean to accommodate as many people at the border by releasing them as you want, right? There is no limit, as you read the statute, to the number of people that you can release into the United States, right? Congress did not create a limit in that statute. But of course, it's Congress itself that's making these appropriations decisions about But if Congress wants to be there to be the release of a significant or whatever number, all they have to do is not fund detention facilities to keep the number low. And then you would have whatever authority you want to extend the number of people released into the United States to as great an extent as you want. And you say, well, we're not going to. Don't worry about MPP. And you know, maybe that's your decision. But you're sort of making it even harder for you to do anything other than release the people encountered at the border into the United States. Well, this is a statutory... Even though, I don't mean to repeat myself, but it's a significant question. Even though the statute that allows you to release people in the United States says there has to be a significant public benefit. And you say there's a significant public benefit when there aren't enough people, there aren't enough beds in detention. So there's no limit at all on how many you can release into the United States. Well, I think the inherent limit, of course, is the detention capacity. Congress didn't define that... No, no, no. I'm putting that to one side because everybody knows that's not nearly enough beds to take care of the problem. That's right. And this has been... If you don't think it's a problem, you don't want to have... You should add more beds anyway. Well, this is the agency's consistent interpretation of the parole provision. Congress has never disapproved it. It has known the DHS is exercising its parole authority that way. But Mr. Chief Justice, to the extent that the impetus for this question is this sense that contiguous territory return could take care of that issue, I want to forcefully push back on that idea because contiguous territory return cannot be the solution here. Over the life of the program in the prior administration, only 6.5% of individuals we encountered at the border were enrolled in MPP. It has inherent constraints. The statute limits who can be enrolled in MPP. You have to be arriving by land from contiguous territory. We're constrained by what Mexico is willing to consent to with respect to who it will allow to be enrolled in the program, and it's placed important limitations on our exercise of that. There were entire categories of people who were excluded from MPP, like all Mexican nationals. Our international commitments, our non-refoulement obligations likewise provided constraints here. So to the extent that you are concerned about how parole operates, that concern doesn't go away based on implementing MPP. In fact, in the prior administration, when MPP was in full force, still DHS was implementing its parole decisions this way, as it's always done consistently for the past 25 years. I'm sorry, General. I know we're into stereotime, so I don't know. Not just yet. General, going back to Justice Breyer's question, assuming, just for the sake of argument, that there's no injunctive power in the court below, the way you're arguing, how would we ever reach the question that Justice Breyer raised, which is the district court being wrong on its assumption that this may as a shall? How do we reach that question if the injunction was erroneously issued? We think that question would be appropriately reached in the case of an individual non-citizen, and there is, of course, jurisdiction preserved to reserve those kinds of claims in those types of cases. This was Congress channeling the review to those cases. So you would say, we should just say an injunction of any kind is improper? Yes, we think that that is the correct interpretation of 1252-F1. Would we need to reach the declaratory judgment issue in your mind, or should we just simply address whether what's before us, which is the injunction, that it's improper? I think here, the court could just reach the injunction and declare that that's improper. General Prelogar, can I ask you a question about significant public benefit? You've identified the number of beds and the need to prioritize the public benefit that DHS is taking into account and when deciding whether to parole. Can you, is it your position that you cannot consider the significant public benefit in not releasing into Mexico? In other words, that you're only looking at the significant public benefit of releasing into the United States, but not in choosing that option versus the other? So I think with respect to kind of how this is working on the ground, the individual immigration officers, and there are thousands of them who would be responsible for making these decisions, are focused on the actual detention capacity at that moment. With respect to the broader question, though, about using contiguous territory return versus releasing into the interior, I think that's ultimately a policy judgment for the Secretary. It's not as though return to Mexico is costless. It involves an enormous investment of our diplomatic resources and our engagement with that bilateral negotiation. And so I think that the Secretary is well-justified in thinking that in light of the tremendous costs that he identified with the program, and in light of his determination that it actually detracted from other strategies and programs he thought would be more effective in stemming the tide of irregular migration, that he was well-justified in making that policy determination. Let me go back to the individual, sorry. Go ahead, finish up. For the individual determination, so you would say that it is not DHS's practice or responsibility with respect to any individual noncitizen to decide the significant public benefit of paroling into the United States versus sending that particular noncitizen back to Mexico? Well, while MPP was operational, I should take the opportunity to clarify my understanding is that the officers were making those kinds of discretionary decisions, and in fact, the number were actually diverted out of the program, and that's why the numbers are only about 6.5% of those we encountered at the border were enrolled in the program. So there was discretion to not put an individual in MPP while the program was in effect. Thank you. Thank you, General. We'll get back to you. Justice Thomas, anything further? Justice Breyer? Justice Alito? The parole decisions are supposed to be made on a case-by-case basis, right? That's correct. And the statistics that you cite and the statistics that the respondents provided in their brief about the number of individuals who are being paroled every month are very high. So what does it mean for there to be a case-by-case determination? Let's think of the example of people who want to go to a baseball game at Nationals Park. So they all line up, they try to get through the turnstile, and somebody goes through a checklist. Do they have a ticket? Yes. Do they have a gun? No gun. Do they have alcohol? No alcohol. Something to throw in the field? Nothing to throw in the field. Fireworks? Nothing. No fireworks. Fine. Is that a case-by-case determination in your view? I think that that would satisfy the requirement. And that's what you're doing. That's basically what you're doing. You've got a little checklist, and you're going boom, boom, boom, and that's how you can process. Maybe you're right, but that's what you think Congress meant by a case-by-case determination. Yes, we think that Congress required us to give individualized attention to each non-citizen and make an assessment about the categories like flight risk and security concern, and DHS is doing that on the ground. Justice Sotomayor? Counsel, before the MPP program at issue, I thought that there were a lot fewer people, but there were people who were sent back under MPP, correct? I wouldn't call that MPP. That's kind of the broad programmatic use of contiguous territory return. I think what you're referring to was the executive's prior practice on an ad hoc basis of sometimes returning individuals. Then I understood this wrong. I thought that each asylum officer, there were two, I understood from my reading, there were two criterias for MPP. There was a set of criteria that's different than the parole criteria, and that asylum officers determine whether to exercise discretion, if the person fits below the MPP criteria, they would be sent back. Yes, I apologize. I thought you were referring to the prior executive practice before MPP itself was implemented, but yes, under MPP, there was that discretion to choose whether to enroll individuals who were eligible in the program, and of course, there were entire categories of individuals who were excluded from eligibility. Under the prior administration. That's correct, and under this administration as well. Justice Triggin? I have two rather different questions. First, to go back to Justice Alito's question, when he said, aren't you really just using a checklist, and then at the end of your answer, you said, well, you know, what we're doing with respect to each individual is trying to assess flight risk and danger. So that is not just a like, are you a flight risk check, right? That involves something or other. So what do you do with this many people? I mean, you have a lot of officers too, but what do you do to determine flight risk and danger? So this relates to the colloquy I was having with Justice Sotomayor, where we conduct criminal records checks. We take biometric records checks. We assess ties to the community and assess other factors that might bear on the flight risk question, and I do want to push back on the idea that this is anything like just formality, going through a checklist. DHS takes seriously its obligation to responsibly allocate the limited law enforcement resource here of detention beds, and it's not as though it's not giving attention to each individual noncitizen to make these determinations. Okay, my second question takes you to someplace that we have not been, which is the second question presented, and I just wanted to ask this. There's a lot of skepticism on the Fifth Circuit's part that there was a second assessment of this question. In other words, the Fifth Circuit said, oh, you're just sort of adding stuff to the first one. So, and you say, no, this was an independent assessment. I mean, how are we to make that decision? What do you look for in determining whether an assessment is new? I mean, the DACA case basically points to two paths that the agency can take, and one is just to kind of use the initial assessment as a base and add some stuff maybe, and the other is, no, you can start anew, start afresh. How do we decide whether you've started afresh? Well, I think you look in the first instance to the agency action itself, and here the October 29 termination decision was by its own terms a new agency action. The Secretary said, I hereby terminate MPP, and I think that that's fundamentally different than the situation the court confronted in the DACA case where the agency action by its own terms just supplied additional reasoning and said, this is not a new decision. This is an additional context for a decision that was made long ago. But here Secretary Mayorkas did the opposite. He took option two in Regents. He accepted the remand. He engaged in a thorough process of reconsideration. He showed his work. He described in considerable detail exactly what he did, the meetings he held with stakeholders, those in border communities, state and local law enforcement officials, advocates, and proponents for and against MPP. He described the material he had consulted, the congressional records, the litigation records, all of the agency internal memoranda. And then over dozens of pages, he explained the considerations he had taken into account and the conclusions he reached. And I think on that record, this doesn't present a difficult question because there's no doubt that that qualifies as a new agency action. And the Fifth Circuit's contrary conclusion rested on this inapposite reopening doctrine from the D.C. Circuit about statute of limitations issues that respondents aren't even seeking to defend or mention in this court. So I think whatever hard questions could theoretically arise, this isn't one of them. MR.  Justice Gorsuch, Justice Kavanaugh. MR. GORSUCH. I have several questions. If you had sufficient detention capacity, could you still exercise your discretion to parole people into the United States?  TAYLOR I think at that point, we couldn't count as a significant public interest any resource constraints because under the hypothetical, there wouldn't be those resource constraints. That wouldn't, of course, supplant the authority that DHS has to take into account other humanitarian reasons or other significant public interests. But I certainly agree that at that juncture, we wouldn't be relying on these allocation of resource constraints for purposes of complying with that requirement. MR. GORSUCH. Why is that?  TAYLOR At that point, there wouldn't be a significant public interest in trying to preserve the limited resource. MR. GORSUCH. Why would you have to detain them, though? TAYLOR Well, as I said before, we understand Section 1225B2A to set forth Congress's expectation that we should use the detention capacity that we've been afforded. So we're not saying that's a may or that Congress is neutral on the issue. We're simply pointing to the fact that in this circumstance where Congress hasn't given us the bed space and no one disputes that, it's not only permissible but responsible for DHS to take that into account in its detention and release decision. MR. GORSUCH. Congress has expressed a preference for detention where that's available. TAYLOR Yes, we do. We don't think that that is a may or simply neutrality on the issue. MR. GORSUCH. Switching gears, I don't know if this is before us. So my first question is, is the State Farm issue with respect to the October memo before us or not? Because if so, I have a lot of State Farm-related questions to ask you. I'll probably ask you them anyway. But is this before us or not? TAYLOR So, Russ, we didn't ask this Court to review the substance of the October 29th memorandum in recognition that the lower courts haven't considered that issue. Respondents did brief that issue at the end of their brief, and we responded to that in our reply brief. We think if the Court reaches that issue, it should clearly reject their arguments. They're exceedingly weak arguments that this wasn't reasoned decision-making. But I, of course, acknowledge that the lower courts haven't had an opportunity to consider that issue. And I would say that I think the problem that we're trying to address here and the thing we're asking the Court to do is reverse the Fifth Circuit's flawed conclusion that this just isn't in line with the action at all. If State Farm's before us, and if it's not before us here, when will it be before us? TAYLOR So, we fully expect that Texas will amend its complaint back in District Court, and we'll be litigating that issue then. Although, if you're interested in reaching it, then I'm happy to defend it. Well, I'll just ask a couple of questions in case we reach it. There were two parts of the explanation in the October memo that jumped out to me as potentially State Farm-type issues. One is that you said, the memo says that the choice to bring people into the country is because otherwise other more dangerous people would come into the country. In other words, you have a choice between the less dangerous or more dangerous coming into the country. That's on page 28 of the memo. And that strikes me as a false choice because the other option, of course, is to send people to Mexico. So, that's one issue. The other issue is I don't see, and this follows up on Justice Barrett's questions, any real explanation in the October memo of what public means and significant public benefit. Is that the American public? Is that the non-citizen public? Who is that? And if it's the American public, there's no real explanation of how the public is benefited by more people coming into the United States who are not lawfully admitted into the United States and trying, if feasible, for some of those people to remain in Mexico. I'm not saying what the best exercise of policy discretion is there. I'm saying I think the October memo doesn't quite get into what is public benefit, what does it mean, how are we supposed to assess that? So, if I can, I think actually the October 29 memo largely addressed both of those issues by reference to the concerns about detention capacity and the recognition that DHS has not been appropriated to detain each and every non-citizen we encounter by orders of magnitude. And so, what Secretary Mayorkas was acknowledging there is that in applying those release authorities, and it's not just parole, of course, but it's also bond under 1226A, it's appropriate to take account of that limited resource. With respect to how that intersects with the use of contiguous territory return, Secretary Mayorkas gave that sustained attention in the memorandum. He explained that there were enormous costs associated with maintaining that program and with respect to our diplomatic negotiations with Mexico, that we had to divert resources away from other types of bilateral negotiations and cooperation we wish to pursue, that it also drained resources with respect to how DHS can pursue some other policies, and that for all of those reasons, on balance, he found, after giving the issue sustained attention, that MPP just wasn't worth the tremendous cost that it imposed. And if I could make one final point to this line of questioning, I think, again, I want to make clear that it's not as though, to the extent you have concerns about significant public benefit, that MPP cures those concerns. There are inherent limits on the number of people we can enroll. Mexico now, under the court-ordered injunction re-implementation of MPP, is requiring that we process those removal cases within 180 days, and that's a big change from how MPP operated before because it didn't function as intended. There were huge backlogs. People remained in Mexico far longer than anyone had anticipated. There were horrible problems of predatory violence. And to honor that commitment to Mexico, we are very much constrained in the number of people we can enroll in the program. I think this is Justice Barrett's earlier question. I want to try to get a precise answer on this. In considering significant public benefit, is it appropriate for the Secretary to consider the possibility of some people remaining in Mexico against the possibility of all the people for whom there is not detention capacity coming into the United States? Yes, I think that the Secretary could take that consideration into account here. I think that he analyzed at length the tremendous costs imposed by MPP in keeping this program up and running. He identified other strategies that he wished to pursue that he thought would be more effective than MPP. Do you think the memo sufficiently grapples with what the 19 states' amicus brief asserts with respect to the costs to the states and to the people in the United States in terms of increased expenditures? Again, not saying which way that should come out. Do you think that's sufficiently addressed in the October memo? I do think it is. The Secretary took seriously the concern that the district court had raised that in the June 1st termination decision, he hadn't appropriately accounted for the asserted reliance interests of states. There was an entire section of the October 29 memorandum where the Secretary worked through all of the concerns the states had raised, and I think that that certainly satisfies the APA's requirement of reasoned decision making. Thank you. Justice Barrett? Thank you, Justice Kavanaugh. You did a better job asking my questions than I did before. General Prelogar, I just want to follow up one last thing. The question that I have is one of statutory interpretation and what significant public benefit means. As you say, Congress has expressed a preference for detention, and capacity is a limit on that, and it seems like the primary driver of your assessment is significant public benefit. I guess my question is, on the case-by-case basis, when DHS assesses whether any individual noncitizen – whether there would be a significant public benefit to release and parole rather than send back to Mexico or other contiguous territory, what is the benefit? Is that a limit? The Chief Justice said that if you're only considering capacity, that's a pretty capacious term and there might not be any limit. So do you have to take into account, as a matter of statutory interpretation, the public benefit, the significant public benefit of choosing that option, the parole into the territory? Well, I think that Congress, in enacting these various provisions, in no way signaled that it was necessary to think about contiguous territory return with respect to each of these parole decisions. Again, I think that Congress would not have used the unexplained and purely discretionary main return language if it meant to try to transform how the government was thinking about its parole determinations. And so, you know, here, I think that on the ground, DHS immigration officers are looking at each individual noncitizen to make those judgments. And in making those judgments, it's not even clear that there would be an alternative to return to Mexico for all of the reasons I listed before, because of the exclusions under the program, the nonraquaman obligations, the fact that Mexico would never agree or consent to accept everyone that we are currently paroling. So for all of those reasons, I just don't think the statutory structure can work that way. And does that go back to your point that we shouldn't look at this? When you were responding to Justice Breyer earlier saying that you would resist the provisions was passed at a different time. Is that driving part of your answer here? That significant public benefits shouldn't, we shouldn't interpret that as any kind of instruction to the agency to take into account its various options because each of these provisions you're arguing should be more standalone? I think that is absolutely part of it, that it's wrong to think about 1225 as being that kind of self-contained unit. And I would point as well to the fact that we know from the statutory history exactly what Congress was aiming at with the contiguous territory return provision. It wasn't weighing in on how to make those kinds of judgments about significant public benefit. Instead, it was simply trying to reverse that BIA decision that had disapproved the prior kind of ad hoc executive practice of occasionally returning some noncitizens to contiguous territory. Thank you. Justice Breyer? Just, I mean, it may well be wiser just to focus on May. Okay, but just it might happen that we go beyond that and consider this later memo, the October memo, et cetera. What's making me worried about that? I'm not sure if you want to say, and you don't have to, but what is the administration's view of the detention versus the parole? That is, has the administration asked Congress for more money for detention? And how is that relevant? That's floating around in my mind. So don't answer it if you don't want to. If you have something you want to say on it. Congress is, of course, responsible for making those appropriations decisions. And the government has submitted budget requests to Congress trying to balance a variety of different considerations here. Among other things, we asked for more resources for immigration judges who could speed the processing of cases that would allow us to detain more individuals with fewer beds because we'd be able to remove them more quickly by resolving their cases more quickly. We've also asked for funding for alternatives to detention, which would help us supervise a greater number of people and ensure that they're not absconding, that they appear for their hearings. We've asked for more resources for enforcement at the southwest border to hire additional officers. And so all of these ways, I think that we are seriously engaging with whatever challenges exist at the border. Thank you, General. General Stone. Thank you, Mr. Chief Justice, and may it please the Court. This case presents a procedural question about the October memoranda's effect on petitioner's appeal and a substantive question about petitioner's obligations under Section 1225b2. The answer to the procedural question is straightforward. The Fifth Circuit announced only two holdings were in the October memoranda's effect on that appeal. The first is that the termination of MPP via the October memoranda did not deprive the June termination of its status as final agency action for purposes of that court's jurisdiction. The second is that the Fifth Circuit concluded that those memoranda did not moot this case. Petitioners did not challenge the first in their opening brief, and thus Texas did not address the reopening doctrine. And petitioners have affirmatively disclaimed any challenge to the Fifth Circuit's mootness holding in their reply brief. Because petitioners challenged neither holding, the October memoranda provide no basis to disturb the judgment. Petitioners instead asked this court to evaluate the merits of potential APA challenges to the October memos in the first instance and without an administrative record, and then to decide that those memos satisfied the district court's injunction. This is not the proper forum for petitioners to initially seek such relief. This court should also affirm the Fifth Circuit on the substantive question of petitioner's detention obligations under 1225. Jennings held that executive officials must detain aliens who fall within 1225 B-2 scope, and that holding all but forecloses the executive petitioner's arguments under Castle Rock and past practice that that subsection B-2A is discretionary. There are just two other ways to satisfy this detention mandate. Ms. Corton-Jennings mentioned one, parole under section 1182 D-5. The other is to return rather than to detain certain aliens under 1182 B-2C. The Fifth Circuit concluded that the executive was not permitted to rescind MPP and thus to increase its total number of violations of section 1225 B-2A's mandate in lieu of exercising that authority. This court agrees it need go no further. I open the court's questions. General Stone, I know there's not much briefing, but I would like your reaction to the 1252 F-1 problem that we've discussed. Certainly, Your Honor. In candor, I can only give general observations because the United States can find that to a footnote, and we viewed it as certainly inapplicable. That 1252 F-1 specifically prohibits the district court from enjoining the operation or application of Title IV of the Immigration and Nationality Act or APA challenge is against their rescission of a program that would, in fact, exercise their powers underneath B-2C. So we see, in our view, F-1 has just simply nothing, no role to play here. Well, I don't know whether we can dispose of it that easily, but going to the merits, do you think, with your reading of the 1225, do you think that the MPP, as implemented, complied with 1225? MPP, as implemented, reduced the number of violations. It did not fully satisfy the executive mandate, but so far as it went, it complied with the the aliens enrolled in MPP. So you could have brought the same lawsuit against the last administration under your reading of 1225? We could have brought a related lawsuit, Your Honor. We would still be required to adhere to the Administrative Procedure Act's limitations, and at that point, we would be saying that the administration was required to take a certain specific action, which is to say craft a policy in which they would have otherwise some discretion about how to use B-2A, B-2C, and 1182. So has any administration ever applied, complied with 1225 under your reading? I assume not, Your Honor. Petitioners suggest that no administration, no executive has fully complied with their detention obligations. That certainly doesn't prove that past administrations assumed that those obligations could be essentially shirked in the event that they preferred not to use one of Congress's allowed statutory tools, but I have no reason to think that that's incorrect. Assuming you're right, wouldn't it be odd for Congress to leave in place a statute that would appear to be impossible to comply with? No, Your Honor. Congress, as my friends on this side mentioned, had this mandatory detention obligation for over a century. It has added authorities to enable the executive to attempt to meet it additionally. Now, to some extent, I think some of the problem with the question that you're getting at is what happens when Congress doesn't provide enough money to be able to actually require that to be satisfied? Then the executive has to do the best it can with the amount of money that's been appropriated to it and the other lawful authorities it's been provided. So we're just talking then about how much an administration would be out of compliance because they would all be out of compliance? Yes, Your Honor. Each individual who is subject to mandatory detention, as this court described it in the statute, is either detained, returned pursuant to B2C, or otherwise paroled on a case-by-case basis is a separate divisible violation of the Immigration and Nationality Act. To what extent, again, that there might be relief in any of those circumstances, especially if we're talking about them individually, that's a different case? Counsel, I have a different view of history, and perhaps you'll deal with mine, and that is that when Congress knows that something's happening and it responds, or it fails to respond, that that tells us something about its intent. And the General said that the shall language has been in existence since the turn of the century, and that in no time in American history has any administration followed your detain every single illegal immigrant. On top of that, that they have been paroling or bailing out people in the face of that language since the turn of the century, and that the most that Congress has done is pass 1182 and 1226A, the parole and the bail provisions. And at least in the bail application, there's no limit. It just says the Attorney General can do this. In the 1182, it has set parameters, but it didn't set the parameters of the extensive legislative history you cited in your brief. That it intended to limit the number to a narrow few. That was the House bill that was rejected. And it set no limit in 1182. So what do I do if I'm a person who views that history and says whatever Congress didn't do, which is give enough resources or pass legislation that said be inhumane, and detain every person without any resources, that we should accept what the practices have been through generations of presidents? I think, Your Honor, if I understand your question correctly, you should first start with two things. The first is, this court's unequivocal detention mandate in Gen X, how it described section 1225B2A. That was only in 2018, so to the extent that past administrations might have thought that there was some room for discretion on their part, that was a mandatory provision, is something this court told the result. Just deal with the history involving 1182 and 1226A. That's been used since both provisions were passed. And exactly in this way, essentially. The history of 1182D5, the specific amendment that Congress passed to that. Previously, the section had said something to the effect of that parole could be provided by the Attorney General if he determined that it was in the public interest. The 1996 amendment specifically inserted the case-by-case requirement and made an obligation that there had to be either a significant public benefit or urgent humanitarian reason. And so that undoubtedly narrowed the executive's discretion in at least those two ways. It also had a third component, which required the duration of that parole be only so long as that reason or that benefit maintained, kept being the case. So to illustrate what kinds of benefits those might be, physicians actually have certain regulations. Let me call their attention. 8 CFR 212.5, which discusses three kinds of circumstances, among others, that might satisfy as one or the other. One being an individual for whom, essentially, they've got a medical condition for whom detention is simply incompatible, but worsened significantly. Another being a pregnant woman. And a third being an individual who is here to provide testimony to a legislative, adjudicatory, or administrative body. So nothing in how this provision has been interpreted before, at least through those regulations, suggests that it would be a significant public benefit simply to not detain individuals. And that would be a very strange result to consider, given that Congress has made an unequivocal mandate that it wants detention. It doesn't just prefer it the way petitioners have suggested. It has unequivocally mandated that result. So Congress may want detention, but it hasn't come up with the money to provide more beds. Right? So it gets back to General Prelinger's point, which is it's not going to make a difference. You can have MPP and send a limited number of people back to Mexico, although I gather that requires the consent of the Mexican government. I don't know if that's going to be forthcoming or not. And then there's a limited number of beds. I mean, it may mean that it's difficult for them to comply with the law. But what good do you think will come from the requirement that the government keep MPP in place? Put candidly, Your Honor, fewer statutory violations of B-2A is better than more. The United States is required to attempt to comply, even in the face of limited resources, as best it can with the resources it's been appropriated. Of course, the hard part—I'm sorry. The only point I would make is that that remains true. But given their termination of MPP, the most that does, as I can see it, is make it more difficult for them to comply with the law. I think it's a bit much for Texas to substitute itself for the Secretary and say that you may want to terminate this, but you have to keep it because it will reduce to a slight extent your violations of the law. Certainly not, Your Honor. And Texas isn't seeking injunctive relief to require the administration to take any particular view of immigration policy. Texas is bringing a garden variety or two garden variety APA claims, one of which is sort of the traditional arbitrary and capricious that I mentioned earlier during my opening. The other is that, in fact, this is not consistent with Section 1225 because this will predictably—and this is a finding of fact that was made by the district court after it was hotly contested on trial on the merits—that the rescission of MPP will cause the government to systemically increase its 1225A obligation or its violation of its 1225B2A obligations. That's the reason, in the APA sense, that rescission doesn't comply with law. Now, to speak to— Well, General Stone, it doesn't really seem like a garden variety APA thing to basically tell the executive how to implement its foreign and immigration policy. And that's what this does. It puts the United States essentially at the mercy of Mexico. Mexico knows that, you know, if we come out your way, well, Mexico has all the leverage in the world to say, well, you want to do that? You want to comply with the court's order? Here are 20 things that you need to do for us. Or maybe Mexico says, no, we'd like to see you squirm and not be able to comply with the court's order. And so we won't allow you to do the program regardless. And either way, I mean, it puts Mexico in a position vis-a-vis the United States, which I don't think it's really Texas's position to require. A couple of points, Your Honor. The first is whether or not this required, in order to be implemented initially, Mexico's consent was a question of fact litigated on the merits in the district court. The district court made a finding of fact, which I don't understand petitioners to be challenging for clear error, that the United States was able to initially implement MPP. Mexico can change its mind any day. Well, certainly, Your Honor. And to the extent that petitioners were to show, well, Mexico has changed its mind and— Or Mexico can change the conditions that it imposes for consenting any day. And the point is that requiring the secretary to do something like this essentially says to Mexico, it's all yours. You have control. I mean, they do have control. You're putting the secretary's immigration decisions in the hands of Mexico. I disagree, Your Honor. Three quick points, the first of which being this court recognized in Massachusetts versus EPA that though the president undoubtedly has broad foreign policy discretion powers in dealing with foreign governments, that doesn't give the president a basis for ignoring a congressional command. The second is that the district court's injunction here does not, in fact, require negotiation with Mexico by its own terms. In fact, had the president, had the United States gone to the district court and sought to modify the injunction on the basis that they can no longer implement MPP in good faith because of Mexican noncompliance, that strikes me as a very strong reason by which the district court would be required in the rubric of a Rule 60b-5 motion to permit it to not have to continue MPP. You're putting a district court in the position of assessing the secretary's determinations about what its negotiations with Mexico have been like, about whether Mexico is demanding too much, about which conditions Mexico is— How can a district court do that? Certainly not, Your Honor. Certainly not. The district court would not be able to superman over the negotiations with Mexico. It only has to continue implementing MPP in good faith. If it turns out in good faith because of Mexican non-consent or obstruction, the amount is none, but that's all the injunction requires in the first place. But somehow, the secretary has to walk in and convince a district court that Mexico's and it can no longer implement MPP, or it can only implement it to a certain extent. And that's a daily obligation on the part of the secretary to walk into district court and say what Mexico is asking, what the U.S. government is willing to give, etc., etc. Certainly not a daily obligation, Your Honor. I can only imagine the secretary having to do anything like that if we sought to enforce the permanent injunction. I think the question is the same question that I have. Think of this court. And this court is basically being asked—the only question I saw relevant here is what about the Mexico program? And you have a procedural argument and you have a substantive argument. OK, let's look at the presumptive argument. Remember, isn't this true? One, there are cases written by, if not me, at least by people I knew in this court, which said where Congress and the president want something the political branches have greater than ordinary responsibility for determining immigration policy. And here Congress has not appropriated the detention money. Two, opinions written by people I actually didn't know, like John Marshall, you know, have said that where Congress, where foreign affairs is involved, you don't have to be you can be as specific as Justice Kagan said or not, but foreign affairs is involved. And judges, this is above your pay grade, OK? Stay out of it as much as you can. And three, they use the word may. And four, there is no indication. This has been in existence for years past at different times, and there is no indication that Congress tied that may, which is in section C, to the detention, which is in detention A. You have created a very good argument. But Congress nowhere has said anything like that. To the contrary, they didn't pass the money. So one, Congress. Two, foreign. Three, may. Four, at different times with no connection. And you heard their policy arguments. Now, you may disagree with their policy arguments, but it's pretty hard to say those policy arguments are beyond the pale created by one, two, three, and four. What's your response? I'm making an argument, but what's your response? Respectfully, I may need help keeping all four questions straight in my head so far. One was foreign affairs. Two is immigration. Three is the fact they use the word may. And four is the fact that, in fact, it passed at different times and no evidence of any connection in Congress between C and A. The Congress and foreign affairs piece, I think I can address simultaneously. First of all, again, as I just said to Justice Kagan, nothing about this injunction actually requires negotiation with the foreign power. But in the extent that to some extent this court thought that it did, of course, the foreign affairs power is shared between Congress. I'm sorry, I have to stop you there, General, and you can get the other four questions. But what do you mean it doesn't require negotiation with the foreign power? What are we supposed to do, just drive truckloads of people into Mexico and leave them without negotiating with Mexico? First of all, MPP has to be continued in good faith and to the extent that Mexico does not consent or otherwise obstructs. Again, I think that would be an excellent reason for the government to go back to the district court and seek relief from the injunction. Second, the particular authority on which MPP relies, B2C, was passed in 1996, where Congress was very well aware of the country through which most inadmissible aliens arriving on land proceed. And Congress did not see fit to require the consent of a foreign country before giving this as a supplemental tool to the United States to discharge its mandatory B2A options. If that has foreign policy consequences, that's a function of the fact that Congress has foreign policy decisions. It makes as well. Congress made one of them through B2C. And all we've asked the district court to do is to prevent the United States from increasing its number of 1225 B2A violations. So to the extent that there's a foreign policy implication, at most, it comes from the fact that Congress, well aware of the fact that we'd be dealing essentially with Mexico here, made a decision regarding B2C and then directed the president, you must do this, except unless you do this. Well, that's a good segue into Justice Breyer's May question, because actually Congress just said May. Congress, aware that Mexico is a sovereign nation, did not think it appropriate to say you must ship people back to Mexico. It understood that there was going to have to be discretion and significant foreign policy considerations involved in that choice. To speak as to the shall and may components, it's not that B2C ever stops being a may. It's that when the only choice the United States has is either to exercise B2C, assuming it can do so lawfully, or to violate the law, petitioners are not free simply to violate the law. That is a bedrock of their take care obligations. And if they can lawfully exercise their authority under B2C, they must do so, so as to not violate 1225 B2A. The premise... I was just going to say there might be a limited circumstance under a specific case where some other mandatory federal law prevents the exercise in that condition, but those would be edge cases. You can't avoid, Justice Breyer, the remainder, the three quarters of his question that are still outstanding. Immigration, May, and Congress. I hope I've spoken at least to the foreign policy component with Congress, which is to the preferred foreign policy through B2C. To the extent that Congress has, in fact, not appropriated a sufficient amount of money in order to detain everyone simultaneously, it has several different options it's given. And then at most, what that means is that the executive has to do the best it can with the resources it has. It's a bit of a strange argument here for petitioners to say they have limited resources when, again, the district court found that the use of MPP would cause fewer individuals to attempt to migrate illegally or inadmissibly, and that those individuals, of course, would not require detention capacity. So as a matter of fact, again, here after a full trial on the merits, MPP reduces detention costs. Again, my friends on the other side occasionally sort of tussle with these facts as though that we're in a sort of posture of where we're asking for a stay as opposed to we're defending a final judgment of a district court with extensive factual findings. But here we are. And to one, I'm sorry, I don't want to, I don't want to sort of speak to Prince, any of your other questions. Well, the heart of this case, I think, is what a significant public benefit mean under 1182, because your arguments make a lot of sense. But the other sides, the government's arguments make a lot of sense when they articulate the significant public benefit exception. And the question comes down to what does that mean? What does it encompass reasonably, more a state farm type question, and have they reasonably explained why this would be a significant public benefit? And that's the heart of the case. I mean, yes, 1225 does have a mandatory detention. It does have the may for return to Mexico. But 1182 is the key because there's this very significant public benefit for paroling everyone in the United States. And they say consistent with past practice that that language authorizes in a situation of limited capacity for parole to be in the United States. So you need to deal with significant public benefit. Absolutely, Justice Kavanaugh. So to speak, there's sort of a factual question here about what the United States will do that was found, as a matter of fact, by the district court. And then a legal question is the extent of significant public benefit. They're sort of interrelated. So let me try and start with the fact. Through findings of fact 41, 42, and 44, and on paragraphs 106 and 107, which I believe around 201A and 202A of its decision, the district court determined after this question was litigated about what the United States would do, in fact, if it had rescinded MPP, the district court determined that the United States would release additional individuals illegally into the United States. It acknowledged in a footnote right before that conclusion that it knew that 1182 provided an authority for release on a case-by-case basis, relied on the parts of the administrative record to state that that could not be used or could not, as a matter of fact, be used in order to supplement detention or return, and then said to the extent that the United States were to attempt to do so by saying... It's not really getting at what significant public benefit is, I don't think. I mean, significant public benefit, they say, is when there's limited detention capacity, past practice, and their current application of this somewhat vague provision, significant public benefit, authorizes the government to parole people into the United States on a case-by-case basis if they're not too dangerous. Why is that wrong, either as a matter of statutory interpretation, state farm, or their explanation? It's wrong both as a matter of fact and as a matter of interpretation. As a matter of fact, let me turn you to ECF 136, the same material that my friends on their latest report regarding compliance with the injunction, where the United States... Why is it wrong as a matter of interpretation? Can you flip the order of your... Absolutely. Your Honor, again, the United States has already interpreted what it viewed a significant public benefit to be and what it thinks case-by-case adjudication is. So its regulation 8 CFR 212.5 describes several of those circumstances. The notion that sort of public benefits also can include the United States... But it has a catch-all at the end of the regulation about public interest. Certainly, Your Honor, that no longer tracks the statutory language as it's discussed... Yeah, but if you're pointing to the regulation, you're omitting the capacious term at the end of the regulation. If I'm reading it correctly, correct me if I'm wrong. As I believe we described in our brief, that's a relic of the previous version. But it's still in the reg, correct? Yes, and to the extent that they relied on that as a matter of statutory interpretation, that would be wrong. Significant public benefit superimposed itself upon what originally was public interest. The kinds of things that are described as a public benefit here are specific case-by-case individuals, sort of dire circumstances, an individual of a serious health problem, or an individual who, for public benefit, is going to be providing testimony. The notion that Congress created a scheme wherein B2A expressed an unequivocal detention obligation but then said, because this isn't simply a matter of whether or not there's going to be the exercise of parole, but whether or not the United States wishes to use its B2C authority, but its refusal to use that authority and refusal to detain individuals is a significant public benefit, certainly is a very strange contradiction in the language of the statute. You make a good point. I think the examples I did cite were witness testimony, and I agree with that. But the phrase, significant public benefit, that's a common... in statutes. And D.C. Circuit, this court, give a lot of deference to agencies to figure out how they're going to apply those terms, and that's... the language is a bit of an issue for you, unless you revert to the structure of the statute expresses a preference for return to Mexico over parole. Again, not merely a preference. That is a mandatory detention obligation in this court's words in Geneva. Yeah, but the question... I'm sorry to keep interrupting, but the question is, you can't meet that. And the statute gives you... the overall statutory structure gives you two options then, at least in the May, return to Mexico or parole in the United States if significant public benefit. And the question is, why can't an administration say significant public benefit is triggered in this situation? I had two points on it. The first were the statutory points and the relationship between 1182 as a way of satisfying B2A and B2C sort of dual requirement. The other part is a matter of fact based on the submission that the petitioner has offered to the district court after... and this is under their captions. They list about 120,000 individuals that they categorize as under 1225 of B2, so they're certainly 1225 individuals. Out of those, they announce that they have paroled roughly, and this is rough numbers, 40,000. Of those, they've said they paroled under on a case-by-case basis or for significant public benefit, about 6,000. And so the actual practice right now certainly doesn't map on to what petitioners are describing. I might also call attention to in that document, the United States flatly admits that is releasing on their own recognizance something on the order of 31,000 aliens who would be subject to 1225B. That's precisely the kind of systemic violation of law that even if MPP would not altogether alleviate, and it certainly wouldn't, would at least reduce. So my friend on the other side's arguments to the effect of that our actual practice or our past practice with 1182D makes the district court's finding that we will increase our violations clearly erroneous or wrong, or just wrong as a matter of law, is in the face of their multiple, multiple reports where they haven't even, as a matter of their own assertions, contested that 1182 was being used, even as a matter of all of their paroles. And this puts aside 1226 because these are clearly 1225 aliens under their own heading. Okay, but General Stone, returning to the question of interpretation, which you have to surmount, it's not just a matter of fact, again, returning to Justice Kavanaugh's question about significant public interest, you lose, right? If, if the government is right about what significant public interest is, and that prioritizing the beds, you know, based on who would be dangerous, you know, who would be the worst aliens to permit into the United States, right? If they're right about that, if they're right about significant public interest, you lose. Am I right? No, Your Honor. Putting aside the State Farm and all that, I'm just talking on the statutory interpretation question. No, Your Honor, in part because this injunction rests critically on what the United States would do if it rescinded MPP. As a matter of fact, along with, and I'll turn back to the statutory point, the United States attempted to prove that it would in fact use 1182D-5 to satisfy these obligations, and thus it could not be required to continue MPP because that was unnecessary. It wouldn't violate 1225 anyway. That is a matter of fact that was based on a trial in which this was hotly disputed. So the United States would have to prove both, that in fact it could use 1182D-5 to address the entire swath of individuals, obviously coming into different circumstances, under different conditions, to do so, and that it would do so in fact in order to get a modification of the injunction, which would belong below. Does the statute allow DHS to say that there would be a significant public benefit in paroling an entire category of aliens, a large class of aliens? Far from it, Your Honor. The 1996 amendment to 1182D-5 specifically inserted a case-by-case requirement, and again, read together with B-2A and B-2C, it's very difficult to see how the significant public given a mandatory detention obligation could simply be the preference not to detain or to return. Counsel, I have never seen Congress use a may language of the way you say. There are other parts of the INA itself that says you do this or you do that. If you can't do this, you do this other thing. This is not an either or. The statute's not written that way. And you said that it becomes mandatory because they can't do A, but where does the discretion fit in? Meaning, they're not challenging that they rescinded this policy erroneously in June. They're saying we did the right thing in October. We looked at it anew, we've given all of these reasons, and we've explained why the cost of this program and running it is not in the best interest of the United States, because we can detain more people and act more expeditiously if we spend that money a different way. You're now telling us that we as judges should be in the business of deciding whether that policy choice is one that we think who wants, that we as a court want? Where does Congress say that it shall need to do this? Because I don't see it in the language. They left it discretionary. Having left it discretionary, why isn't that the answer itself? That the policy has been terminated, or the rescission of the policy in June, which is what the district court had before it, was terminated, and the injunction has to be lifted until you prove that the rescission was wrong? Three reasons, Your Honor. The first of which being where the may becomes mandatory. It's only in the limited circumstance where that is the only way that the executive can- It's already happened. They've done it. They did it and looked at it and said, this doesn't make sense. Our discretion says we shouldn't use this. So it's been considered. It was considered by the old administration. They followed it to an extent, not completely, because they carved out huge numbers of categories of people they weren't sending back, and you are telling me they violated two. They now had it before them. They've given thought to it, and they've said, as a matter of our discretion, continuing this program doesn't further the shot because we can do more with the money in other ways. Respectfully, Your Honor, our arguments don't depend on the policy wisdom of MPP or any other particular approach to immigration. They rely in here specifically on the APA merits of the June termination. We agree with the United States that the merits of the October termination under the APA are not properly before this court, and they weren't properly- So why shouldn't we just lift this to say, June is over with. It's not being challenged. There's a new program. You don't need the injunction. In part because, Your Honor, that would be one of two things, as I understand it, either an appeal to mootness, which, of course, they've already disclaimed they're not challenging the Fifth Circuit's holding on, or otherwise a request under Rule 60b-5 to set aside the injunction. We're here after a trial on the merits of having received- Well, the injunction might be moved, but the lawsuit is not moved. They're claiming there are still issues to be resolved, including the October issue. But the reasons for the injunction are over with. So why should we leave extent an injunction that's not necessary? Your Honor, to the extent that they have not affirmatively disclaimed the position that the injunction is moot, it would be upon them to show that, in fact, it had become moot because of their intervening actions, which they don't attempt. And then in response, of course, we'd cite this court's voluntary cessation doctrine in all candor. The United States' approach to mootness here, when it argued below, was something along lines of that they debated review by accomplishing repetition. And so we believe there are good reasons that this case wouldn't be moot if that, in fact, had been joined by the United States. Nothing in the Fifth Circuit's opinion below, nor should from this court, rest on whether or not the APA merits of the October matter are good, bad, or otherwise. That's a matter for them when they return to the district court and seek relief from this injunction. So the questions I was pushing you on, how to interpret significant public benefit, I also alluded to the fact there are State Farm issues, potentially that did they have discretion, did they reasonably exercise their discretion, and have they sufficiently explained their exercise of discretion, very similar to the State Farm opinion itself. You're saying those concerns, which I was pressing your friend on the other side about, are not before us? No, Your Honor, but to the extent this court were to reach them in the reply brief, they can't admit they don't. Can I just stop? They're not before us? They're not before you, in part, because there's no administrative record. Thank you, General. Justice Thomas, anything further? Justice Breyer? Justice Sotomayor, anything further? Justice Gorsuch? How do you see this playing out, then, on the October memo? That this court should affirm the Fifth Circuit's affirmance of the district court's injunction, and that with the October memoranda and the October administrative record, the United States should go to the district court, seek relief under Rule 60b-5, and say either we have fully satisfied both conditions, or at minimum, for the APA purposes, we've satisfied the APA compliance condition, and if they have, then, of course, it'd be an abuse of discretion for the district court to deny modifying or satisfying the injunction as a matter of law, and if they haven't, then, of course, we'll litigate that there. Justice Barrett? Thank you, Counsel. Rebuttal, General Prelinger? Thank you, Mr. Chief Justice. Let me make one quick factual correction, and then I'll turn to a couple of points on the statutory question in the case. First, I just want to respond on the facts with respect to our monthly reports to the district court. General Stone has misunderstood the data in that report. All of the parole decisions that DHS is making are on a case-by-case basis. The different categories on that report refer to different ways that DHS codes this data in its database, but those are all following DHS's own regulations, which themselves require case-by-case assessment. The orders of recognizance that are referred to in that report are the grants of conditional parole under Section 1226A. Texas hasn't even challenged our reliance on 1226A in this case. Turning to the statutory issue, my friend conceded to Justice Thomas that MPP itself was unlawful. He's conceded that on his interpretation, every presidential administration has been openly violating the INA. I think that that is incredibly powerful and persuasive evidence that that interpretation is incorrect. Second, I want to respond, Justice Kavanaugh, to some of your questions about significant public interest. We have not just generated that consideration of detention capacity for purposes of this case that has been the executive branch's uniform, consistent interpretation of how our parole authority operates. It's encompassed in our regulations, contrary to what General Stone said, based on that catch-all category that you referenced that specifically authorizes release for other significant public interest, and it makes sense. Because in a world where we don't have sufficient beds, as everyone acknowledges, there is an imperative public interest in ensuring that we are detaining the people who might be criminals or who might abscond or who threaten our national security, and not simply filling those beds on a first-come basis with no accounting for the limited detention capacity. Finally, I'd like to leave the court with a few concluding thoughts on the extraordinary nature of the district court's injunction in this case, and particularly with respect to its effects on foreign relations. As I've explained, the executive cannot implement MPP unilaterally. General Stone is simply wrong about that. Mexico has its own sovereignty here, and we are sending individuals onto its territory, so we need to get Mexico's consent to operate the program. That gives Mexico an important point of leverage, as Justice Kagan emphasized in those negotiations, and that's what the district court has ordered here. It has ordered us to conduct those ongoing negotiations with Mexico. It's not just to start up the program. It is coordinating on all of the day-to-day logistics of operating a massive cross-border program like this. The individuals who are returned under MPP need a place to live. They need work authorization. They need access to counsel. They need to be protected against predatory violence from gangs and cartels. We need to coordinate on the logistics of transferring them back and forth across the border into the United States for their immigration hearings, and then back to Mexico to continue to await the results of those proceedings. And in all of that, we have to have ongoing logistical negotiations with Mexico. The State Department has told me that it has a weekly call with the Department of State, the Department of Homeland Security, and their counterparts in the government of Mexico to talk about regional migration and negotiate with respect to all of these logistical details. So I think the idea here that there is a single district court in Texas that is mandating those results, that is compelling the executive to engage in those ongoing negotiations, and so under the constant threat of a contempt motion from Texas to supervise our good faith negotiations with Mexico shows that something has powerfully gone awry here. This is not how our constitutional structure is supposed to operate, and this is not the statute that Congress drafted. So we'd ask the court to reverse the flawed judgment below. Thank you, General. General, the case is submitted.